The first case for argument this morning is 16-2616, Praxair v. Mallinckrodt. And we've got a cross-appeal here too. Mr. Peterson, whenever you're ready. Thank you. May it please the court. Your Honor, William Peterson on behalf of the Appellant and Cross-Appellee, Praxair Distribution, Inc. In the main appeal, which concerns only Claim 9, the Board erred in three respects. First, Dependent Claim 9 was not briefed separately by Mallinckrodt and should not have been addressed separately by the Board. Second, the Board failed to give the phrase in accordance with its broadest reasonable interpretation. And third, even under the Board's construction, the Board incorrectly analyzed obviousness. Would you mind going to the third point first? Because that's the one I think has most heft to it. Thank you, Your Honor. Very gladly. It's recognized in the specification and on, in the Board's opinion, page 40 of the Joint Appendix, that pulmonary edema was a known life-threatening side effect that could occur when patients with left ventricular dysfunction were treated with inhaled nitric oxide. So Claim 9 consists of a recommendation, and under the Board's construction, a based on that recommendation step, which involved instructing a doctor to discontinue a known life-threatening treatment when a known life-threatening side effect of that treatment results. And discontinuing the treatment is the only distinguishing factor over claims that have been held invalid. Yes, Your Honor, that's correct. And really, from our perspective, this is simply common sense. It's the first principle of medicine. First of all, do no harm. When a life-threatening treatment results, doctors don't need to be instructed, or life-threatening side effect results, doctors don't need to be instructed that one of the options available to them is to discontinue that treatment. Well, what is the because there was nothing in the prior art that suggested discontinuance under these circumstances? Well, I think that's right, but we actually think the Board misread some of the art that it discussed, both the Barnasconi reference and the I-022 study. Did the Board find a functional relationship between discontinuing and the other steps? The Board found a functional relationship between the recommendation to discontinue treatment and the discontinuing of the treatment, based on its construction of in accordance with, as requiring a causal link between the two. And so for that reason, it gave patentable weight to the recommendation. But again, we think discontinuing is obvious and recommending discontinuance is obvious for the very same reasons. The evidence the Board pointed to in the prior art, the I-022 study, the Barnasconi, the Board said that those references didn't teach excluding patients from treatment with inhaled nitric oxide when they had left ventricular dysfunction. But that's something not what CLAIM 9 requires. I'm not sure I understand. How would this patent be enforced? Is it a matter of putting on the label of the competing product the mode of use that is to discontinue treatment? Is that where the infringement would arise? Well, this is a method claim. But the physicians are practicing the method, so they discontinue treatment. How does that benefit your client? I mean, how would it be implemented? You can't license every physician in the nation or every pediatrician. So is it a matter of the label on the product? Yes, I believe that's the case. It would be the label on the product being the providing the recommendations. So it would be an inducement or contributory theory? Yes, Your Honor. And the direct infringer would be the physician who discontinues treatment, right? Yes, Your Honor. But from our perspective, if you look at the item X label, what you'll see is it actually recommends discontinuing treatment based on another known side effect of inhaled nitric oxide therapy. So under KSR, when a physician's looking at the options available to them, when a known side effect of inhaled nitric oxide therapy occurs, one of the options available to them already in the prior art was the discontinuance of treatment. Okay, you're into your rebuttals, which I know you want to save for the cross-appeals. So let's hear from the other side. May it please the Court. Ken Schuler on behalf of Malincroft. This Court should affirm the Board's determination that Claim 9 is patentable, and with it, enter judgment that Claim 11, which is dependent upon Claim 9, is likewise patentable. The Board's determination that the Bernasconi reference, which is the loan reference that was cited by Praxair below, does not teach or suggest the discontinuing step is supported by substantial evidence. Well, if there's a life-threatening event, so what this patent adds, the added limitation is if there's some life-threatening occurrence based on the dosage, then you discontinue. I mean, I know common sense has been somewhat of a controversial notion in some of our case law here with regard to KSR, but isn't this really common sense, common occurrence? I think not for four reasons, and if the Court will indulge me, the first might be, the most important might be the specification itself. In the I-022 study, if you look at Table 7, there were two instances of pulmonary edema during the course of the study. The Table 7 indicates in neither instance was the treatment discontinued, so it was not common wisdom or commonsensical to these physicians to discontinue the treatment. The second point is this is a life-threatening condition that it's indicated for, the neonates that have hypoxic respiratory failure, and so a physician, it's not common sense to discontinue something that's saving the neonate. Third, the Board looked at all the evidence and said they concluded that Bernasconi does not teach or suggest discontinuing I-0 treatment in neonates. It merely says that there's a need for monitoring during I-0 treatment in adults. Now, there's two important things there. The first is our expert explained, Dr. Rosenthal explained, that Bernasconi is a study involving adults, and it's not applicable to neonates, who are not little adults. They have fundamentally different pulmonary vasculature systems. Mr. Schiller, I'd like to interrupt your four points and get to the cross-appeal. I think your argument is that the Board should not have discarded the steps of the method. Isn't printed matter simply an abstract idea reduced to writing? That's one potential way to look at it. I think that in this instance, we know that there's a functional relationship between that printed matter and the remaining steps of the method for a multitude of reasons. Well, what's a functional relationship? Well, that's a very good question, Your Honor. I think a functional relationship is one that's... Making a work together. Well, they do have to work together. I think that there's two interesting examples in the specification that establish that there is a functional relationship. In other words, a causal functional relationship between the information of Clause 2 and the remaining steps of the method. The first of those examples is the I-022 study. As the Court may recall, the study protocol originally indiscriminately allowed for the administration of the nitric oxide gas to the patients regardless of whether they had left ventricular dysfunction. As a matter of law, does the functional relationship test, if we can call it that, survive Alice? Because abstract subject matter is abstract subject matter, and printed matter is mental steps, abstract subject matter reduced to writing. So does that survive Alice? I think it does because if there's a functional relationship with physical steps, and here there is even with Claim 1. Remember, Claim 1 specifies that the information has to be sufficient to cause a physician who's otherwise considering using the nitric oxide gas to elect not to treat one or more of the neonates. That sufficient to cause means that it's specifying a reaction by the physician and one that is causally related, sufficient to cause. In the I-022 study, that's exactly what happened. The information that was provided to the physicians, they were given the gas and one set of exclusion criteria. After the protocol was revised, they were given the gas with a different set of exclusion criteria, and there was an empirical benefit in terms of substantial increase in safety. There was a reduction in the number of adverse events. That was set forth in our declarant, Dr. Rosenthal's declaration, explaining that empirically the information caused a benefit in terms of a reduction in adverse events. So I don't think that Alice would implicate the doctrine in that fashion. So long as there's a functional relationship with other physical steps, then it is patently subject matter. The board also, I think, misread the specification of the second respect. There's additional evidence of a functional relationship, and that is that the information at issue in Clause 2 empirically led the FDA to change the labeling. The information that patients with LBD could suffer from pulmonary edema led to the labeling revision, and that's explained in the specification as well. The other error, I really think the most apt case for the court to consider is the Levine case. There, the court found a functional relationship between color-coding for expiration dates on a pharmaceutical product and the product itself. Which case is that? In Ray Levine. That's 1997 Westlaw 44797. So the court explained the color-coded expiration edition provides information about the drug, i.e. the substrate. And the same is true here. The information in the clause provides information. Did you cite that case in your brief? It's in our rec library. Not in the rec? I think it's in both rec libraries. I think it was originally cited by Praxair, and we cited it as well. And so there's information that tells the physician information about the drug, i.e. who it can be safely administered to. The court found a functional relationship. What about AstraZeneca and King? Didn't at least one of those cases deal with instruction? Yeah, I think that's distinguishable on multiple grounds. The first is there was nothing really tying the instructions to the method. It was just, you know, give the drug. Here, Claim 1, again, explicitly says that the information has to be sufficient to cause a reaction by a physician. So Claim 1 itself recites a functional relationship. I think in AstraZeneca, there was really no tie between the kit and the drug. You say there's a functional relationship between providing information or recommendation between that and the physical steps. But what are the physical steps providing nitric oxide? This almost sounds like Mayo. Minor physical steps and abstract ideas. I respectfully disagree, Your Honor. I think that there's supplying the I know, there's obtaining the I know, and there's supplying to the physician. And again, Claim 1 recites that there has to be information sufficient to cause a reaction by the physician. In other words, the physician who is otherwise considering giving the drug to a patient with LVD elects not to treat them. So that's a physical reaction. And I think that that's not abstract at all. You're not claiming a method of treatment of this ailment with nitric oxide. Not in this, other than Claim 9. That's in the prior art. I think Claim 9 does involve treatment. But with regard to our cross appeal, I think you're correct, Your Honor, that Claims 1 through 8 are not explicitly a method of treatment. They're a method of supplying the nitric oxide. So what you've added to the prior art is providing information and a recommendation. Abstract ideas. Well, I don't agree in the sense that if you look at the study, you might call it an abstract idea, but it resulted in a physical change of multiple steps. In other words, the physician stopped treating those patients that have pre-existing LVD. And as Dr. Rodenthal explained, it led to a substantial improvement in the safety attributes. Now, the board made an observation, Your Honor, that the drug inherently causes this effect. Well, if that's true, the only way to make it safer is to change physician behavior with information. You can't make the drug itself any safer. And so in a real world sense, not an abstract sense, the way that safety gets implemented in the medical field is by educating physicians about... So what is it in the claims other than Claim 9? So they say providing information, and then where is the language about what they're going to do with this information? In which claim? I'm asking you. I mean, Claim 1. I mean, what I said is other than Claim 9, because we've already dealt with that. In Claim 1, there is the... So it's Part 2. Claim 1 mandates that the information in Clause 2 be, quote, sufficient to cause a medical provider considering inhaled nitric oxide treatment for a plurality of neonatal patients who are, A, have pre-existing left ventricular dysfunction to elect to avoid treating one or more plurality of patients with inhaled nitric oxide to avoid putting them at risk for pulmonary edema. So the action it causes is to allow the physician to consider doing this? To elect not to treat those patients... Elect. So it doesn't say you have to do it, this is necessarily required. It says to elect to avoid treatment. I think sufficient to cause is both causal and establishes a functional relationship. The information has to be sufficient to cause a reaction by the physician, and we think that that is exactly what a functional relationship is. And the claim recites it, and the specification supports that there's a functional relationship between the specific information at issue and the safe and effective administration of nitric oxide. Briefly, I'd like to... I'm going to... Just very briefly and I'll save the rest of my time. There was also a procedural error by the board. They adopted a construction of pharmaceutically acceptable during... In its final decision that neither party had promulgated or proffered under SAS. That's plain error. We never got an opportunity to argue to the board non-obviousness under the construction that neither party had... How can there be a real question about what pharmaceutically acceptable means? Well, neither party thought that there was, Your Honor, and the board adopted a construction that neither party had proffered, and frankly, we don't see in any case law. More interestingly, the board didn't cite any affirmative evidence for its construction. It dealt with our evidence, intrinsic and extrinsic, and said they dismissed... It almost seems whoever raised it, seems like a silly question to me, and it either is physically capable of being administered to a person and is acceptable in terms of toxicity, efficacy. It's an established term. We thought it was too, Your Honor, and that's the construction we proffered. The board came up with the... Well, the difference is you were proffering the inclusion of the word safe, and there was evidence, I think, even by your expert that the board pointed to that that would be kind of a roving term that could be changed just based on the science and the information, and that's what was troubling about adding that particular term, right? I think that was their reason. I think it's misguided because the construction never changes. Pharmaceutically acceptable has the same meaning. What might be in an FDA label, he admitted, does change over time, but remember, the information is already specified in the claim, so the claim's not going to change, right? The Clause 2 specifies what information would be... So what is the import of the difference? They said pharmaceutically acceptable. You said pharmaceutically safe and acceptable, or... We said suitably safe for pharmaceutical use. They said... So what's the difference between the two in your view? I think that Praxair is construing it to be that it's pharmaceutical grade. I don't think that that's a reasonable construction. Morphine, you know, I can hand somebody morphine, and it might be pharmaceutical grade morphine. That doesn't make it pharmaceutically acceptable without information about its safe and effective administration and its addictive properties. I don't think anybody would think that that's reasonable to just hand somebody some morphine and say it's acceptable because it's pharmaceutical grade, it doesn't have any undue toxicity, and it's not laced with fentanyl. That's not suitable for pharmaceutical use. The procedural point, though, is the board never gave us a chance to argue under its construction for the patentability of claims one through eight. Did you request re-hearing from the board either side? We did not. Given that Praxair was appealing claim nine, we decided to appeal to this court in cross-appeal. So with that, I'll turn it over. Okay. You want to save your rebuttal time on your cross-appeal. Thank you. Your Honor, what I heard from my friend, an argument about sufficient to cause, actually requiring the result to actually take place in claim one, is I think a claim construction that I certainly didn't see in Mallincrott's brief, and it's certainly a claim construction that was never argued to the board. Today is the first time that Mallincrott has suggested that the language of claim one, that the information must be sufficient to cause a medical provider to elect to avoid treating, must actually require a medical provider to elect to avoid treating. But when you look at the language of claim one, the steps there are simply obtaining a cylinder containing compressed nitric oxide, supplying the cylinder, and providing information. There's no requirement in claim one that actually requires a patient to be treated, much less a provider to actually make a decision to treat or not to treat based on the information. You need to provide information that is sufficient to cause that result, but claim one doesn't actually require that result. And until today, Mallincrott has never argued that it has. The other argument I heard from my friend is that a functional relationship can be shown empirically. That is, you can look at how a patent is actually practiced and see whether information in practice changes the results of one step, changes decisions that are made by physicians. This court rejected that in NRACAL. That's 639 F3rd 1057. It's a case the board relied on, and we think it's the right guidance for how this court and the board should conduct a functional relationship analysis. If the functional relationship relates to information, does that actually cause a physical change in the active steps of the patent? How does information change a physical step? Well, I think the board's construction of claim nine is probably one in which the functional analysis was correct. Again, we think the board erred in its obviousness under claim nine, and we think the board erred in its construction of it in accordance with. But under the board's make a decision to treat or not treat as a result of its consideration of information. And at least in this court's precedent, when you have that link between the information and the accomplishment of physical steps... So that's another additional limitation. It's not just providing the information, but it's compelling, requiring some action as a result of the information. And that's the difference, in your view, I assume, between claim nine and the other claim two. Absolutely. And at least on the board's, again, what we think is an erroneous construction of claim nine. And when you look at COW... So going back to claim nine just briefly, I know you want to respond to the other thing. So your view of claim nine is, so let's assume there is a functional relationship, and we're not talking about excluding that. But your argument would be, nonetheless, it's obvious. Yes, Your Honor, both the information and the discontinuance as a result of that information. But turning to the other claims, we think that causal relationship between the physical steps and the information is what's lacking from the claims. We were talking about this in respect to Mao. Mao says you can't take a law of nature and patent the claims that simply say apply the law of nature. This is frankly a claim that says, tell someone about a law of nature and keep on doing what you were doing anyway without it actually affecting you. So when you look at the COW case, that's another case where... amount of an oral release dosage form, in that case of oxymorphone. And the patent owner there made arguments that were remarkably similar to Mallinckrodt's empirical arguments here. They said, well, look, in practice, having that information changes what the therapeutically amount of the dose is. And therefore, you can come up with some sort of functional relationship, even though there's not really one in the claims. And this court rejected it. Actually emphasized in the opinion was nothing in the claims requires that the dosage be adjusted in response to the providing of information. So Mallinckrodt hasn't claimed any sort of change in what the physician does. So help us out a little because our cases and even one of our cases may be king where the case initially went down by the district court on a 101 analysis. Our court changed the analysis. I think it was king and went into an obvious analysis. And I agree with him. There's a feel of a 101 here and a Mayo claim with respect to information. So how would you recommend that we resolve this on the traditional printed matter functional relationship or necessarily because of Mayo and recent Supreme Court cases, we should add in a mental step analysis? Well, I think you should resolve it as a form of printed matter. And it's well within the printed matter doctrine. Simply to say that steps under De Stefano which claim the content of information are not given patentable weight can't be used to distinguish claims from the prior art unless that information, whether it's provided, evaluated, received, considered, is functionally related, has some physical effect on one of the active physical steps of the patent. And in that regard, let me actually turn to my friend's discussion of pharmaceutically acceptable. Because, Judge Lori, we agree wholeheartedly with the construction that you suggested, which is what we think the board construed it as. Now, obviously, we don't believe pharmaceutically acceptable is limiting at all. But if it's going to be limiting, the board construed it the right way, which is simply a physically safe, physically non-toxic substance. Well, is that the concern? I mean, your friend is making it first, in the first instance, a procedural argument, a process argument with respect to their not having had the opportunity to respond. So you weren't proposing the construction that the board ultimately adopted, were you? We didn't propose that construction. What we have done is consistently opposed the limitation that Mallicrat seeks to impose through pharmaceutically acceptable. And when they say pharmaceutically acceptable must be safe, what they don't mean is physically safe. What they don't mean is non-toxic. You'll see this page 3962 of the appendix. They agree that pharmaceutically acceptable, the actual content of the cylinder, never changes. So pharmaceutically acceptable has nothing to do with physically what the inhaled nitric oxide is. Instead, Mr. Shuler was asked on page 3975 by the board, I'm trying to figure out how pharmaceutically acceptable makes your canister different than any other canister that's out there. And what he answered was, it's the information that goes with it. So what Mallicrat's been saying is pharmaceutically acceptable doesn't mean physically safe. It means safe because you are given information that allows it to be used safely. Praxair has consistently opposed that, primarily by arguing that the preamble is not limiting. And critically here, this is not a situation in which the board adopted a construction of the parties changed that construction in its final written decision or at the hearing. That's what we think happened with respect to claim nine, where both parties agreed with the construction in the institution decision. And then at the hearing, the board proposed a new construction without notice. There was no construction of pharmaceutically acceptable in the institution decision. Mallicrat briefed its arguments about the meaning of pharmaceutically acceptable at patent owner's response. Mallicrat knew going into the hearing that the correctness of this construction and the limitations imposed by pharmaceutically acceptable were in dispute. The board considered those arguments and simply found them wanting. In that regard, we do think this is perhaps most similar to the intellectual ventures to versus Erickson case. This court's May 17th, or sorry, May 8th decision from 2017. So we don't see any procedural issues here with Mallicrat's construction of pharmaceutically acceptable. It still doesn't create the sort of functional relationship between the informational steps and the active steps of the claims. Mallicrat's construction simply transforms pharmaceutically acceptable itself into a printed matter limitation because under Mallicrat's construction, pharmaceutically acceptable is claiming the content of information. It's pharmaceutically acceptable depending on whether or not there's particular information that goes along with the inhaled nitric oxide. So with Mallicrat would then need to show a functional relationship between the pharmaceutically acceptable nitric oxide and the physical steps of obtaining and supplying nitric oxide. And Mallicrat hasn't attempted to make that link. So in our view, however you end up, it's during pharmaceutically acceptable. If you accept the board's view, it's not a printed matter limitation. It's a physical limitation, but there's no functional relationship between that physical limitation and the informational step. And there's no functional relationship between that informational step and the physical steps of obtaining and supplying. Although the board obviously never had to reach that analysis because they construed it differently, right? No, Your Honor. I didn't get good on that route. Unless the panel has further questions, I think I've made the points I'd like to make. Thank you. Briefly, I think that there was some suggestion that we had not argued the sufficient to cause language. That's at page 38 of our brief on appeal. I think it's clear what the plain language of the claim means. The counsel made a point about not transforming the canister or the cylinder of gas, and I think that's a misguided point. This was not a product claim. The printed matter doesn't have to transform the product. It's a method claim. And so the question is whether the information, the printed matter transforms the known method of supplying the gas. And we know that it did. Because prior to the transformation, the printed matter being given to the physicians in the study, they were indiscriminately giving the drug to patients that whether or not they had left ventricular dysfunction. There were a series of adverse events that were substantially higher than expected. The printed matter went with the gas with the revision, supplied the gas to the same physicians with the printed matter that said don't give it to people with LBD. And there was a substantial reduction in the number of severe adverse events. That is an empirical and functional relationship between the printed matter and the supply of the gas. The same gas, but the information changed how the physicians acted and it changed the safety profile of the drug. And that is the paradigmatic example of a functional relationship. Thank you. We thank both sides and the case is submitted.